TRESSLER COAL MINING COMPANY *v.* JULIUS KLEFELD *et al.*

(No. 8629)

Submitted January 12, 1938.   Decided February 1, 1938.

*Ira E. Robinson* and *E. Wayne Talbott,* for appellant.
*Robert C. Morris,* for appellees.

RILEY, JUDGE:

The Tressler Coal Mining Company, a corporation, prosecutes this appeal from a decree of the circuit court of Barbour county, dissolving a temporary injunction enjoining the sale of two tracts of coal under a certain deed of trust executed by G. B. Hartley and wife to H. H. Rose, trustee, and dismissing Julius Klefeld, the transferee of the notes secured by said deed of trust, and H. H. Rose, trustee, from the suit.

It appears that on November 16, 1925, G. B. Hartley, the owner in fee of nine tracts of coal in Barbour county, West Virginia, by deed of trust, his wife joining therein, conveyed the same to H. H. Rose, trustee, to secure an indebtedness of $25,000.00, evidenced by notes payable to the order of D. A. Maurer, the last of which was payable thirty months from the date of the deed of trust. Sometime prior to October 11, 1928, Maurer transferred the notes to Julius Klefeld. On the last-mentioned date, the Hartleys and S. B. Tressler executed an instrument, whereby the former leased to the latter, for coal mining purposes, two tracts (totalling 36 acres) embraced in the deed of trust. Klefeld, by a writing dated October 24, 1928, agreed and consented, upon certain conditions set forth therein, to a mining lease entered into by the Hartleys and Tressler, "which said lease bears date the

11th day of October, 1928." Tressler, on August 1, 1934, assigned his rights under the lease to Tressler Coal Mining Company, the plaintiff herein. Payments of royalties under the lease to Klefeld having ceased for a considerable period, Rose, trustee, at direction of Klefeld, advertised the leased tracts for sale on August 9, 1935. The present suit followed.

The lease heretofore referred to provided for an actual royalty of fifteen cents per net ton of coal and a minimum annual royalty of $1,500.00. By it the lessee agreed to pay the lessor at the rate of at least 1,350 net tons of coal per foot acre, except where the seam is less than fifty inches in thickness, or is faulty making it unreasonably hard to mine, or where the coal is not merchantable. It was further provided therein that, when all the coal shall have been mined out of the leased premises, except 20,000 net tons, then the lessee should not be required to pay any further royalty, and the 20,000 net tons so remaining may either be operated under the provisions of the lease, except as to the payment of royalty, or the lessee may, at his option, elect to become the owner thereof, without any further payment of any kind or character, and after all merchantable coal remaining in the leased premises, determined on the basis of 1,350 net tons per foot acre, as aforesaid, has been paid for, excepting therefrom the last 20,000 net tons aforesaid, then the lessee shall have the right to mine and remove the remainder of the coal including the said 20,000 net tons, so paid for but not mined by said lessee without any further or other payment.

On the date of the execution, acknowledgment and recordation of the foregoing lease, Hartley and wife and Tressler, by a second writing, referred to in the body thereof as "this supplemental memorandum and agreement", and which, by its terms, was made a part of the lease, acknowledged payment by Tressler of $5,000.00, $2,000.00 of which was a loan, represented by a promissory note of even date and $3,000.00, an advance on royalties to become due under the lease, or, at Tressler's option, to be taken as the payment on the last 20,000 tons of coal remaining in place. This memorandum and sup-

plementary agreement was made without Klefeld's knowledge and consent.

Klefeld agreed and consented, so far as he was interested therein, as appears from the instrument executed by him, to the execution of the lease, and to all the terms and conditions thereof "but without in any manner waiving any of his rights under said deed of trust, it being understood that the royalties due under said lease are to be paid to said undersigned in discharge of said indebtedness, and the interest thereon, until the same is fully paid off by said royalties or otherwise."

In his answer, Klefeld denied, among other things, (1) that he had knowledge of the secondary, or supplementary, agreement and memorandum between the Hartleys and Tressler; (2) that the coal removed by Tressler and the plaintiff company was paid for; and (3) that the covenants of lease were performed by Tressler or his assignee.

The court, having considered the pleadings, exhibits therewith, and the depositions—which depositions conflicted radically as to whether Tressler had mined all the coal, except the reserved 20,000 tons as provided by the lease, and was in full compliance with the lease as to payment of royalties—took the position, as appears from the decree and the memorandum accompanying same, that by the consent agreement, Klefeld did not waive his rights to have the property described in the deed of trust sold upon default of the payment of his notes secured by said deed of trust, and that "there was an attempt to perpetrate a fraud upon" him.

It seems quite apparent to us that the first and controlling issue is, how much minable coal remains in the hill? If there are remaining only 20,000 tons, as contended for by the plaintiff, the attempt to establish fraud, on the sole ground that the lease was executed in two parts, falls. If more remains, then the matter of Klefeld's information, or lack thereof, concerning the execution of the second paper may have a place in this case. The chancellor apparently ignored the phase of the case, involving a conflict in the testimony, and, in the ab-

sence of an explanation for the execution of the lease in two papers instead of one, coupled with Klefeld's statement that he had no knowledge of the second paper, came to the conclusion that there was an "attempted fraud" on Klefeld.

Assuming the secondary agreement of October 11, 1928, was executed without Klefeld's knowledge, was it fraudulent as to him? In this connection, there are two kinds of fraud: (1) actual or positive fraud, which would vitiate the agreement *ab initio,* and (2) such inequitable or fraudulent conduct, which, under the clean-hands doctrine, would preclude the plaintiff from recovery.

Clearly, actual fraud does not enter into this case. Such fraud is never presumed. It must be both alleged and proved, and the allegation must be with such precision as to exclude every construction "except the fraudulent or wrongful purpose." *Loomis* v. *Jackson,* 6 W. Va. 613; *Charter* v. *Kump,* 109 W. Va. 33, 152 S. E. 780. The answer in the instant case simply alleges that Klefeld did not know of the secondary agreement and at no place is there an allegation that the withholding of knowledge was fraudulent. The agreement not being fraudulent on its face, the mere allegation that it was executed without Klefeld's knowledge is insufficient. And, so far as the record discloses, no injury has been established.

If the entire 36 acres involved had yielded merchantable coal of fifty inches or more in thickness, the royalties therefrom no doubt would have been more than sufficient to pay off the notes held by Klefeld, and to have offset the advance of royalties to Hartley, under the supplement to the lease. Such a situation would preclude resort to the clean-hands doctrine.

An appellate court will not sustain a finding denying relief to a party to a chancery cause on the theory of inequitable conduct (unclean hands), unless the evidence establishes that such party has dealt unfairly in respect of the matters involved. Before the chancellor, in the instant case, would be warranted in invoking the clean-hands doctrine it should appear (1) that Hartley and Tressler, at the time of the execution of the lease, thought

there was insufficient coal to pay Klefeld in full; (2) that, in fact, all royalties were not applied on the Klefeld notes; and (3) that all minable coal, except the 20,000 net tons, had not been actually exhausted. These issues were not fully and clearly developed and were not adjudicated by the trial court as heretofore indicated. In the absence of their solution in favor of Klefeld, he has no real or apparent interest in the secondary agreement, as that agreement, in the final analysis, is solely between Hartley and Tressler, and has nothing to do with the consent agreement between Klefeld and Hartley.

The sale sought to be enjoined involved the two leased tracts to the exclusion of the remaining seven. A sale under the deed of trust, in view of Klefeld's consent, would be subject, in any event, to the terms of the primary lease. Under no condition, in the absence of a showing that the unleased tracts of coal are unavailable for sale under the deed of trust, can a sale of the two leased tracts be had without recourse first having been made to the unleased tracts. The lease is an alienation of the two tracts. In equity, they are protected from the operation of the deed of trust until recourse is had to the other tracts. *Morris* v. *Baird,* 72 W. Va. 1, 78 S. E. 371, Ann. Cas. 1915A, 1273. The gratuitous statement in Klefeld's brief to the effect that the deed of trust was released as to one of the unleased tracts and the other tracts have been sold to the state for taxes, is supported by neither the pleadings nor proof. For such defense to be available, both pleadings and proof are necessary.

For the foregoing reasons, we think the final decree is erroneous and the injunction was improperly dissolved. Only upon remand can equity and justice be done between the parties. We therefore reverse the decree and remand the cause for further development and for adjudication not in conflict with the principles contained in this opinion.

*Reversed and remanded.*